IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEVEN JAMES BERLINER,

    Petitioner,

v.

BRIAN GEERS, et al.,

    Respondents.

Case No. 3:15-cv-01787-SI

OPINION AND ORDER

Nell Brown
Assistant Federal Public Defender
101 S.W. Main Street, Suite 1700
Portland, Oregon 97204

    Attorney for Petitioner

Ellen F. Rosenblum, Attorney General
Kristen E. Boyd, Assistant Attorney General
Department of Justice
1162 Court Street NE
Salem, Oregon 97310

    Attorneys for Respondents

SIMON, District Judge.

Petitioner brings this habeas corpus case pursuant to 28 U.S.C. § 2254 challenging the legality of several state-court convictions. For the reasons that follow, the Amended Petition for Writ of Habeas Corpus (#1) is denied.

## **BACKGROUND**

The background facts, as stated by the Oregon Court of Appeals during Petitioner's direct appeal, are as follows:

> Defendant attended a party at the home of a neighbor in rural Lincoln County. He began drinking beer and smoking marijuana shortly after he arrived and continued to do so until around 10:00 p.m. when he and two friends decided to leave the party to go to a bar. They started off in defendant's vehicle, a 1972 sport utility vehicle that defendant used to go "mudding." The vehicle had a roll bar, but no doors and no top. Defendant was driving. Nobody was wearing a seat belt, and defendant was carrying a cup of beer in one hand. As he started down a hilly, wooded road, he lost control of the vehicle. It hit a tree and rolled down a steep embankment. All three occupants were injured and taken to a hospital where one of the passengers died from his injuries. Also at the hospital, a laboratory technician supervised a test to determine defendant's blood alcohol content (BAC) based on the alcohol content of his blood plasma, but not his whole blood. That test showed a BAC of .086.

*State v. Berliner*, 232 Or. App. 539, 222 P.3d 744 (2009).

The Lincoln County Grand Jury indicted Petitioner on one count of each of the following: Manslaughter in the First Degree, Manslaughter in the Second Degree, Assault in the Third Degree, Driving Under the Influence, Reckless Driving, Recklessly

2 - OPINION AND ORDER

Endangering Another, and Driving While Suspended. Respondents' Exhibit 102. Petitioner's first trial resulted in a hung jury, and the State re-tried him.

Petitioner's primary strategy was to establish that he had not actually been the driver of the vehicle. Secondarily (and the focus of this Opinion), he sought to challenge the State's representation that his BAC exceeded Oregon's legal limit of .08. The vehicular accident occurred at 10:10 p.m. The hospital performed a plasma test of Petitioner's blood at 11:50 pm and reported a .086 BAC result. Authorities obtained a warrant for two additional blood draws which the Oregon State Crime Lab analyzed using a "whole blood" method and found Petitioner's BCA to be .02 at 1:15 a.m. and .01 at 2:20 a.m.

At trial, the State offered only the 11:50 p.m. hospital .086 BAC result to establish that Petitioner was intoxicated at the time of the accident. Petitioner's attorney called Dr. Raymond Grimsbo, a forensic scientist, to testify about the hospital's method of testing Petitioner's blood. Dr. Grimsbo was prepared to testify that the hospital did not use the whole blood "gold standard" of testing as utilized by the Oregon State Crime Lab, and instead determined BAC based off of the plasma portion of the blood sample only. The State objected to Dr. Grimsbo's testimony before he could fully present it, and the prosecutor examined Dr. Grimsbo outside the presence of the jury.

Dr. Grimsbo was of the opinion that the plasma testing method employed by the hospital would produce a result 15% higher than the whole blood test used by the Crime Lab. He was therefore prepared to testify that where the plasma-based hospital test revealed a .086 BAC, when adjusted to reflect gold standard testing where the plasma has not been "spun off" from the whole blood, Petitioner's BAC was actually .073, placing him below the legal limit of .08. Trial Transcript, p. 1718. In the event the jury concluded Petitioner was the driver of the vehicle, trial counsel intended to demonstrate that he did not behave in a manner that manifested an extreme indifference to the value of human life so as to justify a Manslaughter conviction because his BAC was within permissible limits.

The trial judge repeatedly explained to Petitioner's attorney that he needed to lay a proper foundation for the testimony, that he needed to "draw that nexus between [Dr. Grimsbo's] opinion and, um, that which actually occurred in this case on one level or another." *Id* at 1751. The judge noted that his "comfort level, even now, is being tested as far as what I've said, uh, because I don't know that it's my role to provide the answers." *Id* at 1751-52. It appears the judge was waiting for counsel to seek leave to admit the whole blood tests from the Crime Lab, but counsel never did. The judge ultimately refused to permit Dr. Grimsbo to testify for lack of a proper foundation, *id*

at 1759, the jury convicted Petitioner on all counts, and the trial court sentenced him to 120 months in prison.

During his direct appeal, Petitioner argued in relevant part that: (1) the evidence adduced from the BAC hospital test was inadmissible because the testing was not done pursuant to statutory requirements; and (2) the trial court erred when it did not allow Dr. Grimsbo to testify that the .086 BAC was artificially elevated because the test relied on blood plasma, not whole blood. The Court of Appeals found that although the issues "present interesting questions," it did not need to address them because a person is considered to be driving under the influence of intoxicants in Oregon either with a .08 BAC, or if the person is under the influence of liquor or a controlled substance. It noted that Petitioner testified at trial not only that he consumed ten cups of beer and smoked marijuana at the party, but also that he was intoxicated and impaired when he left. *Berliner,* 232 Or. App. at 545. It therefore concluded that any error regarding the BAC was harmless. Petitioner sought further review in the Oregon Supreme Court, which was denied. 348 Or. 291, 231 P.3d 795 (2010).

Petitioner next filed for post-conviction relief ("PCR") in Umatilla County where he claimed that a competent trial attorney would have recognized the exculpatory value of the Crime Lab's whole blood tests and offered them as evidence. The PCR court denied relief on this claim as well as others not relevant to

this habeas proceeding. The Oregon Court of Appeals affirmed the PCR court's decision without opinion, and the Oregon Supreme Court denied review. *Berliner v. Coursey*, 266 Or. App. 229, 337 P.3d 204 (2014), *rev. denied,* 356 Or. 689, 344 P.3d 1111 (2015).

Petitioner filed this 28 U.S.C. § 2254 habeas corpus case on September 21, 2015, and the Court appointed counsel to represent him shortly thereafter. With the assistance of counsel, Petitioner argues that he received ineffective assistance of trial counsel when his attorney failed to: (1) introduce valid, exculpatory BAC evidence in the form of the Crime Lab results; (2) adequately object to the hospital's plasma test; and (3) elicit relevant testimony from Dr. Grimsbo regarding the invalid BAC evidence.

## I. Unargued Claims

The Petition for Writ of Habeas Corpus raises 19 grounds for relief, and Petitioner's argued claims represent Grounds Eight and Ten. Petitioner does not argue the merits of his remaining claims in his briefing, nor does he address any of Respondents' arguments as to why relief on these claims should be denied. The Court has examined these claims on the existing record and the *pro se* Petition and concluded that Petitioner has not carried his burden of proof. *See Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (Petitioner bears the burden of proving his claims).

///

///

## II. Claims Properly Before This Court

Respondents assert that Petitioner failed to fairly present his argued claims that counsel failed to move to suppress the hospital draw, or introduce expert testimony from Dr. Grimsbo challenging the plasma test,[1] leaving them procedurally defaulted. *See Rose v. Lundy*, 455 U.S. 509, 519 (1982) (requiring a habeas petitioner to present his claims to a state's highest court in order to preserve them for federal habeas review). He directs this Court's attention to the PCR Petition for Review filed in the Oregon Supreme Court where Petitioner clearly framed the issue presented as whether counsel was constitutionally ineffective "for failing to offer the results of an exculpatory blood alcohol test into evidence during a jury trial when the test contradicts the results of a blood test offered by the state and the defendant's level of intoxication is directly at issue[.]" Respondents' Exhibit 142, p. 15.

As Petitioner points out, his argued claims are all necessarily reliant upon whether counsel failed to appreciate the significance of, and present evidence of, the results from the Crime Lab blood testing. The Court views the claim broadly to state that trial counsel's failure to recognize the importance of the Crime Lab results and introduce them prevented him from

---

[1] Petitioner also suggests that counsel should have obtained an independent blood test but does not pursue this claim beyond his initial brief, recognizing that it "is not essential to [his] claim." Reply (#59), p. 4 n.2.

effectively presenting Dr. Grimsbo's testimony so as to mount a challenge to the State's plasma test result.

III. **Standard of Review**

An application for a writ of habeas corpus shall not be granted unless adjudication of the claim in state court resulted in a decision that was: (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant relief "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id* at 413. The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous. *Id* at 410.

Twenty-eight U.S.C. § 2254(d) "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents. It goes no farther." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Twenty-eight U.S.C. § 2254(d)(2) allows a petitioner to "challenge the substance of the state court's findings and attempt to show that those findings were not supported by substantial evidence in the state court record." *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012). A federal habeas court cannot overturn a state court decision on factual grounds "unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). This is a "'daunting standard—one that will be satisfied in relatively few cases,' especially because we must be 'particularly deferential to our state-court colleagues.'" *Hernandez v. Holland*, 750 F.3d 843, 857 (9th Cir. 2014) (quoting *Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004)).

## IV. Analysis

Petitioner argues that although his trial attorney was aware of the science that shows plasma-derived BAC results are artificially high, counsel missed a critical opportunity to establish this fact by ignoring the Crime Lab results. He claims that with normal, general BAC dissipation rates which he

estimates to be .0175 per hour, he could not have possibly gone from a .086 BAC to a .02 BAC in approximately 90 minutes. He further contends that his personal dissipation is demonstrably less, .01 per hour, given his 1:15 a.m. (.02 BAC) and 2:20 a.m. (.01 BAC) results from the Crime Lab. Based upon this math, Petitioner estimates that he could not have had a BAC of more than .045 at the time of the accident, placing him well below the legal limit. He reasons that counsel could have used the "gold standard" results from the Crime Lab to show the invalidity of the plasma test (with the help of Dr. Grimsbo), thereby demonstrating Petitioner was not intoxicated and therefore did not act with the intent necessary to support a Manslaughter conviction.

Because no Supreme Court precedent is directly on point that corresponds to the facts of this case, the Court uses the general two-part test established by the Supreme Court to determine whether Petitioner received ineffective assistance of counsel. *Knowles v. Mirzayance*, 556 U.S. 111, 122-23 (2009). First, Petitioner must show that his counsel's performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 686-87 (1984). Due to the difficulties in evaluating counsel's performance, courts must indulge a strong presumption that the conduct falls within the "wide range of reasonable professional assistance." *Id* at 689.

Second, Petitioner must show that his counsel's performance prejudiced the defense. The appropriate test for prejudice is whether Petitioner can show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id* at 694. A reasonable probability is one which is sufficient to undermine confidence in the outcome of the trial. *Id* at 696. When *Strickland's* general standard is combined with the standard of review governing 28 U.S.C. § 2254 habeas corpus cases, the result is a "doubly deferential judicial review." *Mirzayance*, 556 U.S. at 122.

Trial counsel was deposed prior to Petitioner's PCR hearing, and he stated that he did not seek out an independent blood test because he feared it might show Petitioner to be over the legal limit at the time of the accident. This, in turn, would have prevented him from calling Dr. Grimsbo to challenge the plasma test. Respondents' Exhibit 134, p. 45. He reasoned, "even if I had gotten a blood draw that said, Okay, so instead of being .084, whatever, it was actually .075, it's close enough that the jury could still pound him." *Id* at 45-46. Counsel was concerned that he might prevail on the DUI charge but lose on the Manslaughter charge in this fashion. *Id* at 46. Counsel had the following exchange with Petitioner's PCR attorney:

> Q: And then on Mr. Grimsbo's testimony, I read his testimony and your attempt to get him to offer an opinion that a blood result on the hospital blood, which was an .08,

there's some percentage that he could come up
with to maybe get it lower than an .08.

A. Right. When you do one test, you get a
particular number, and the other test that
Grimsbo was advocating for that I think was
actually the standard for DUIIs anyway, we
would give a certain percentage beneath the
other test, which would be the one that was
done at the hospital. But I don't remember
what the percentage was.

Q. Like a .075 or something. He was trying
to get it lower than the .08?

A. Right, based on mathematical
calculations. Not so much on a test of the
blood but on a test of what he saw in the
reports from the hospital blood test.

* * * * *

Q. The blood tests that were done and
analyzed by the crime lab, pursuant to the
search warrant that was obtained by the
State, did those results come in?

A. I don't remember that stuff.

Q. Because the way I recall, from looking
at the crime lab report, they were obviously
taken a number of hours afterwards because
they had to do a search warrant and they were
taken at 4:00 or 5:00 in the morning. They
were like an .01 or .02. And if you
extrapolate them back pursuant to this
formula, it came back to about an .08 or
between .07 and .08.

So it sounds like the prosecutor just wanted
to use what the blood results were from the
hospital.

A. I don't know what she was thinking
regarding the evidence, and I'm sorry, I
don't really remember too much about the
State Crime Lab's results. I remember what
the hospital said, and that's what I was
focusing on because that's what I was trying
to refute with Mr. Grimsbo.

> Q. Do you remember if anybody from the crime lab came and testified about those results?
>
> A. No, I don't remember that.

Respondents' Exhibit 134, pp. 48-59.

During the subsequent PCR hearing, after Petitioner's PCR attorney finished questioning trial counsel, the PCR Court granted Petitioner leave to personally question his former attorney:

> Q: Mr. Reim, why didn't you introduce these whole blood test results at either trial?
>
> A: Which – which test results are you talking about? The – from the State Police thing?
>
> Q: The–the tests that were done at the Oregon State Police Crime Lab.
>
> A: Right. The reason for that is this: First of all, my expert talked about blood alcohol levels – that would be helpful.
>
> Second of all, I was kind of worried about dissipation rates. There's a range of dissipation rates and over the – between – blood was drawn – let's see – time of the accident if dissipation continues could have pushed your alcohol level either below .08 or above .08.
>
> So it . . . could have cut both ways. Additionally, if I started talking about dissipation rates and that was going to bring that into issue and I didn't want to do that when Dr. Grimsbo had admitted to me questions about dissipation rates (indiscernible) whatever his level was when the hospital blood draw would have been higher (indiscernible) rate at the time of the accident if that makes sense. Does that clarify it?

13 - OPINION AND ORDER

> Q: Did you look at the crime lab results?
>
> A: Yes, I was (indiscernible) law test showed.
>
> Q: Those results were .01 and .02 taken at 1:15 and 2:20 in the morning. And the dissipation rate was one percent per hour. And if you would have calculated back to the accident, the BAC would have been 0.035, well below the legal limit. Were you aware of that?
>
> A: I don't necessarily agree with that, Mr. Berliner. Certainly, my expert didn't suggest that as a possibility and I'm not certain that that's actually correct. I don't think the dissipation rate has been definitively established.
>
> Q: Don't you think that that would be relevant evidence in a DUI Manslaughter case?
>
> A: I think that it could have been relevant evidence. However, I think the number was the thing that was actually in question and that was where the danger lay as far as I was concerned.
>
> Q: Isn't it something that you should have discussed with your client?
>
> A: I discussed it with the expert, sir.
>
> Q: So you think it was okay to with[o]ld this evidence from your client?
>
> A: I don't think I withheld anything, sir.
>
> Q: Did you show me these test results?
>
> A: I sent to you all the discovery that I got. I believe that was in the - I did send that to you.

Respondents' Exhibit 135, pp. 27-29.

The PCR Court resolved the issue this way:

> . . . although there's some things that you wonder about as far as the blood alcohol I – don't think that's before the Court. On the other hand, I'm not convinced for purposes of this record that it would have made any difference anyway because I think we're not just talking about alcohol.
>
> We don't know what the evidence would be as far as dissipation rates. It hits me kind of cold from what I've heard in the past about what the alcohol content would have been at the time of the accident as opposed to when that was taken at the hospital. But putting all that aside, I don't think that's before us.
>
> I am not convinced that trial counsel's performance was below the constitutional standard either under the State or the federal Constitution and I'm going to deny the petition.

Respondents' Exhibit 135, pp. 44-45.

The PCR court determined that without evidence of dissipation rates, Petitioner was unable to prove his claim. In addition, the PCR judge doubted that the result of the proceeding would have been different even if Petitioner could establish that a more accurate reading of his BAC at the time of the hospital plasma test was below .08. The judge noted that because Petitioner had smoked marijuana in addition to his alcohol consumption, the BAC was not the only indicator of Petitioner's impairment.

Petitioner argues that based upon the Crime Lab results and the apparent dissipation rate they collectively establish, his BAC could not possibly have been above the legal limit. In this respect, he appears to challenge the PCR court's decision as

involving an unreasonable determination of the facts in light of the evidence presented. Specifically, he takes issue with the PCR court's determination that the dissipation rates were an unknown quantity.

Petitioner's own PCR attorney estimated Petitioner's BAC to be between .07 and .08 during trial counsel's deposition. Respondents' Exhibit 134, p. 49 ("and if you extrapolate them back pursuant to this formula, it comes back to about an .08 or between an .07 and .08."). This evidence was available to the PCR judge, who also heard Petitioner's conflicting estimate that his BAC was .035 at the time of the accident. Respondents' Exhibit 135, p. 28. The judge also heard trial counsel disagree with Petitioner's proposed dissipation rates, "I don't think the dissipation rate has been definitively established." Id. Based upon the evidence before him, the PCR judge specifically stated, "We don't know what the evidence would be as far as dissipation rates," and noted that the claimed dissipation rates were not consistent with his experience. Id at 44. Although Respondents' Exhibit 125 contains a detailed analysis of the BAC measurements and purports to scientifically establish Petitioner's dissipation rate, the PCR court refused to admit the Exhibit because it pertaining to an untimely amended PCR petition that was never filed.[2] Respondents' Exhibit 135, pp. 4-7. Based upon this

---

[2] Despite its exclusion in state court, Petitioner asks the Court to consider the contents of Respondent's Exhibit 125. This Court must assess Petitioner's claims based upon the record the PCR court had before it. See Cullen v.

16 - OPINION AND ORDER

record, the PCR court did not clearly err in finding that Petitioner had not established the dissipation rate.

Even if this Court were to agree that Petitioner had somehow established his dissipation rate in the PCR Court in the absence of any expert evidence such that he was not legally intoxicated with alcohol at the time of the accident, and further assuming the Court were to conclude that trial counsel was obligated to admit the Crime Lab results,[3] Petitioner still would not be entitled to habeas relief where he fails to refute the PCR court's decision that he suffered no prejudice. The PCR court focused on the fact that Petitioner mixed alcohol and marijuana before operating a motor vehicle such that he engaged in the kind of reckless conduct that would subject him to a Manslaughter conviction. This was similar to the Oregon Court of Appeals' analysis on direct appeal which focused on Petitioner's testimony that he had consumed alcohol and marijuana and believed himself to be impaired and intoxicated when he left the party. Respondents' Exhibit 105, p. 5.

---

*Pinholster,* 131 S.Ct. 1388, 1400 (2011). Even if Petitioner could introduce Respondents' Exhibit 125 here, its would not change the ultimate outcome of this case.

[3] Although Petitioner makes much of the fact that counsel could not remember the specifics regarding the Crime Lab reports, the record shows that counsel considered this evidence, consulted with Dr. Grimsbo about it, and that Dr. Grimsbo believed that the best path forward was to ignore evidence about dissipation rates. Respondents' Exhibit 135, pp. 27-29. Counsel believed that focusing solely on the purportedly faulty plasma test, without giving the jury an opportunity to conclude the dissipation rate worked against Petitioner given the delay between the vehicular accident and the hospital draw, gave Petitioner his best chance to prevail. This is a strategic decision that, even though unsuccessful, counsel was permitted to make.

17 - OPINION AND ORDER

Although Petitioner claims he suffered prejudice because he would not have testified at trial at all had counsel introduced the Crime Lab results, this argument is unconvincing where Petitioner's primary defense relied upon his testimony that he was not the driver of the vehicle.[4] Consequently, even if Petitioner had established that trial counsel's performance fell below an objective standard of reasonableness, he could not show resulting prejudice. For all of these reasons, Petitioner is not entitled to habeas corpus relief.

## CONCLUSION

For the reasons identified above, the Petition for Writ of Habeas Corpus (#1) is denied. The Court allows a Certificate of Appealability as to Petitioner's argued claims of ineffective assistance of trial counsel.

IT IS SO ORDERED.

DATED this 22nd day of January, 2019.

_____
Michael H. Simon
United States District Judge

---

[4] Moreover, the prejudice argument Petitioner presented to the PCR court appears to be somewhat different. In his Declaration prepared for the PCR action, Petitioner stated that had he known about the Crime Lab results, he would have testified that he was not intoxicated. Respondents' Exhibit 135, p. 42. The PCR judge found Petitioner could not have it both ways, and found him not to be credible on this issue. Respondents' Exhibit 135, pp. 42-43.